**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ZAINAB KAMARA,                                    *

Plaintiff                                          *

v                                                  *          Civil Action No. ELH-16-2747

WEXFORD HEALTH SOURCES                            *
INCORPORATED, *et al.*,
                                                   *
Defendants

                                                  ***

**MEMORANDUM OPINION**

Zainab Kamara, the self-represented plaintiff, is a state inmate confined at the Maryland

Correctional Institution for Women  ("MCIW") in Jessup, Maryland.  She filed suit on August 2,

2016, naming as defendants Wexford Health Sources, Inc. ("Wexford"), Daniel L. Conn, and

Jaya Singh, M.D.  ECF 1.  Kamara alleges deliberate indifference to her medical needs.  Plaintiff

also submitted exhibits with her suit.  Plaintiff seeks injunctive relief requiring ongoing medical

care for her injuries.  In addition, she seeks an unspecified sum of monetary damages "for the

emotional trauma [she has] suffered by continually having to pursue basic medical care." ECF 1

at 5.

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment.

ECF 8.  It is supported by a memorandum of law (ECF 8-3) (collectively, "Motion") and several

exhibits.

Plaintiff was informed by the court, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th

Cir. 1975), of her right to respond, and that failure to respond could result in dismissal of the

complaint or entry of judgment against her.  ECF 9.  In response, plaintiff filed a "Motion To

Stay Or Denied [sic] Defendant's [sic] Summary Judgment."  ECF 10.  Among other things,

Kamara asserted that she did not have "sufficient opportunity to obtain the necessary facts."  *Id.*

at 1.  She also claimed that summary judgment would be premature because she has not had the opportunity for discovery.  *Id.*  In addition, Kamara filed a "Motion For Certification of the Class."  ECF 11.  Defendants opposed plaintiff's requests. ECF 12.

Plaintiff's requests for discovery and to certify a class were denied by the court  in an Order of May 17, 2017.  ECF 14.  But, plaintiff was granted additional time, until June 23, 2017, to file further opposition to the pending motion.  *Id.*  She has not done so.

The court finds a hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow, defendants' Motion, construed as a motion for summary judgment, shall be granted.

## I.  Procedural Background

On November 19, 2014, while Ms. Kamara was detained at the Prince George's County Department of Corrections, she was the victim of a brutal attack by a fellow detainee.  *See* ELH-15-3952; *see also* 2017 WL 735549 (D. Md. Feb. 24, 2017).[1]  As a result of the assault, Kamara unsuccessfully brought suit against various defendants, alleging failure to protect and deliberate indifference to medical needs.  *Id.*  It appears that some of Kamara's current medical complaints are rooted in the injuries she sustained during that incident.

Plaintiff alleges in this case that she suffers from headaches and has fluid leaking from her nose. ECF 1 at 3-4.  According to plaintiff, she has asked Dr. Singh to refer her to an outside physician (*id.* at 3), but Dr. Singh has refused, advising plaintiff that she is "no different from anyone else who complaints of headache."  *Id.*  Further, plaintiff alleges that Dr. Singh has denied her pain medication.  *Id.* at 4.

---

[1]  A court may take judicial notice of other cases.  *See Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 Fed. App'x. 200 (4th Cir. 2016).

Kamara indicates that on April 24, 2016, she wrote to Conn, "President and CEO" of Wexford, regarding the need for an MRI. *Id*. at 7.  He advised that she needed to follow all administrative remedy procedures ("ARP"). *Id*.; ECF 1-1 at 2.  Plaintiff states that she filed an ARP regarding her lack of medical care (*id*. at 5), which was found meritorious.  *Id*. at 4.  *See also*  ECF 1-1 at 4. Additionally, plaintiff notes that the Prison Rights Information System of Maryland ("PRISM") "got involved and noted that Wexford Health had 30 days starting from 6/29/16 to refer [plaintiff] for either a CT/MRI or a lab analysis of the fluid leaking from her nose," but she was not sent for further evaluation.  ECF 1 at 3; ECF 1-1 at 1.

Defendants have submitted pertinent medical records as well as an Affidavit from Jaya Singh, M.D., in support of their Motion.  ECF 8-4 (medical records); ECF 8-5 (Singh Affidavit).

The undisputed records demonstrate that upon plaintiff's transfer to MCIW, she underwent an initial health assessment on July 21, 2015, by Mayann Darko, P.A.  ECF 8-4 at 1-3. At that time, plaintiff reported that she suffered from headaches. *Id*. at 1. No dizziness, emotional disturbances, or nasal discharge were observed. *Id*. at 1-2.  She was prescribed Tums, Zyrtec, and Naproxen and was scheduled to be seen at the chronic care clinic for internal medicine. *Id*. at 3.

Dr. Singh evaluated plaintiff on July 28, 2015, for a chronic care visit. *Id*. at 4-5. Plaintiff complained of headaches and advised that she had been hit on her head during an altercation in November 2014 at the Prince George's County jail. *Id*. at 4. She reported suffering headaches intermittently. Plaintiff's gait, coordination, and balance were intact and she was observed sitting comfortably in the chair.  *Id*.  Her examination was otherwise unremarkable. *Id*. She was prescribed Colace and Tums. *Id*. at 5.

3

Plaintiff was seen on September 21, 2015, by Della Sangah, R.N.P., during sick call. ECF 8-4 at 6-7.  She requested Naproxen for headache and back pain, indicating that she received moderate relief from Naproxen.  *Id.* at 6.  Kamara denied any recent injuries and rated her pain as 6/10.  *Id.*  Plaintiff's physical examination revealed no posterior tenderness of the spine. She had full range of motion and was observed sitting comfortably in the chair. *Id.* at 6-7. Naproxen was prescribed for one month.  *Id.* at 7.

Dr. Singh evaluated plaintiff on October 5, 2015, during a chronic care visit.  *Id.* 8-9.  It was noted that plaintiff had missed her appointments for laboratory work and a pap smear. *Id.*  at 8.  Her gait, coordination, and balance were intact and she was observed sitting comfortably. *Id.* Plaintiff complained of heartburn and advised that Tums was not helping. She also complained of allergy symptoms, including nasal congestion. *Id.*  She insisted on a prescription for Zyrtec although she had an active prescription for Vistaril (a medication that reduces activity in the central nervous system and which also acts as an antihistamine).[2] *Id.*  Examination revealed no nasal deformity and plaintiff's mucous membranes were normal. *Id.* She was prescribed Zyrtec, Zantac, and nasal spray.  *Id.* at 9.

Della Sangah, R.N.P., saw plaintiff for an urgent provider visit on October 22, 2016, after she was found vomiting and on the floor in the housing unit. *Id.* at 10. Plaintiff had visited the dispensary earlier that day complaining of a headache. *Id.* She rated the headache pain as 9/10 and reported dizziness.  She stated that she had a history of headaches stemming from an altercation in November 2014. *Id.*  Kamara denied any cerebrovascular accident or surgery. Physical examination, including examination of the nasal membranes, was normal, but plaintiff's blood pressure was high. *Id.* at 10-11.  She was provided Tylenol ES 500 mg twice daily as

---

[2] See https://www.drugs.com/vistaril.html.

needed.  ECF 8-4 at 11. Two hours later, plaintiff's blood pressure was reduced and she rated her pain at 4/10. *Id*. It was determined that plaintiff would continue to be monitored in the dispensary for one hour and if her vital signs remained stable she would be discharged to her housing unit, to return the next morning for follow up.  *Id.*  She was seen the following day by Della Sangah, R.N.P., for follow-up. *Id*. at 12.  At that time, plaintiff reported that she felt much better and rated her headache pain as 2/10. *Id*.

Dr. Singh evaluated plaintiff on December 23, 2015, during a chronic care visit.  *Id*. at 14-15.  She was observed sitting comfortably in the chair. *Id*. at 13. Kamara complained of occasional headaches and asked for Excedrin. Her gait, coordination, and balance were intact. *Id.*  She had an active prescription for Excedrin Migraine through December 25, 2015, and the prescription was extended to January 4, 2015.  *Id*. at 15.

Plaintiff was again evaluated by Dr. Singh on March 10, 2016, during a chronic care visit. *Id*. at 16-17.  The chronic care nurse was also present for the evaluation. *Id*. at 16. Plaintiff's gait, coordination, and balance were intact. She was observed sitting comfortably. She answered questions appropriately. *Id*. She denied recent injury and indicated that she was suing the Prince George's county jail for head trauma suffered in November 2014. *Id*. Plaintiff's chart was reviewed. It was noted that there were no records from the Prince George's County detention center concerning a head injury. Plaintiff advised that she was in the process of getting those records and was directed by staff  to notify the medical department once she had received them. *Id*.  Plaintiff became angry and threatened that she had already reported her complaints to DOC headquarters, PRISM, and various government agencies her complaints.  She left the room without a complete examination. *Id*.

On March 31, 2016, plaintiff was seen by Jacob Tendler, M.D., for medication management in regard to her symptoms of depression and anxiety.  ECF 8-4 at 18.  Plaintiff described her mood as depressed and anxious, but denied suicidal ideations.  No psychotic disturbances or paranoia were reported or noted.  *Id.*  She was assessed as being irritable, moderately depressed, and anxious. *Id*.

During a provider sick call, on April 4, 2016, plaintiff's prescriptions for Naproxen and Zyrtec were renewed. *Id*. at 21-22.  Her nasal and mucosal membranes were normal. *Id*.

A medical emergency occurred on May 12, 2016, when plaintiff slipped and fell while descending stairs while wearing plastic flip-flops.  *Id.* at 23.  Plaintiff was evaluated by Della Sangah, R.N.P.  Kamara reported that she hit the right side of her face and right shoulder on the floor, and appear3ed in moderate distress.  *Id*. Her examination was normal, other than her report of moderate pain in her left shoulder with motion. *Id*. at 24. She was able to wiggle the fingers on her right hand but would not allow any range of motion to her right elbow or shoulder. *Id*. No malalignment or deformity on the right upper extremity or any part of the body was noted. She was kept in the dispensary for observation for one hour before being discharged and was prescribed Tylenol No. 3 for five days. *Id*. at 25.

Plaintiff was seen the following day by Chidimma Nwabueze, R.N., for a follow-up visit. *Id*. at 26. At that time, plaintiff indicated that she needed to have her blood pressure checked because cerebrospinal fluid ("CSP") was leaking from her nose and her face was twitching. *Id*. Her blood pressure was 140/100. No CSP drainage or twitching was observed.  A mid-level provider was notified and plaintiff was scheduled for a blood pressure check that evening. *Id*.

 Maimuna Olagoke, N.P. saw plaintiff on May 23, 2016, for a provider sick call.  *Id*. at 27-28.  Plaintiff requested a refill of her medication. She reported that the pain in her right

shoulder from the fall was significant and that the Naproxen did not help. She requested stronger medication. ECF 8-4 at 27. However, she reported no vision changes or headaches and her left shoulder had full range of motion. *Id*. at 28. No joint deformity, heat, swelling, erythema, or effusion were noted, but plaintiff's right shoulder had tenderness and moderate pain with motion. She was prescribed Indomethacin, a nonsteroidal anti-inflammatory. *Id.* at 29-30.

On June 10, 2016, plaintiff was seen by N.P. Olagoke for a provider sick call visit. *Id.* at 29-30. Her prescription for Indomethacin was renewed. *Id*.

Dr. Singh saw plaintiff on June 22, 2016, for a chronic care visit. *Id.* at 31-32. Her gait, coordination, and balance were intact and she was observed sitting comfortably in the chair. *Id*. at 31. Plaintiff was described as "angry," although she answered questions appropriately. *Id*. She demanded a CT of her head and Naprosyn for headaches and right arm discomfort. Plaintiff's x-ray results, which were normal, were reviewed with her, as were her laboratory results and medication administration records. *Id*. It was noted that plaintiff's Indomethacin prescription was active and that she had been going to different providers for pain medication, particularly NSAIDs. *Id*. Plaintiff was counselled regarding diet, exercise, weight control, polypharmacy, and the side effects of NSAIDs, including rebound headaches. *Id*. She became argumentative and threatened to report Dr. Singh to her lawyer and to the provider's supervisor. She also demanded refills of muscle rub and benzoyl peroxide and left the room without completing the examination. *Id*.

On July 27, 2016, during a provider sick call, plaintiff's prescriptions for Naprosyn, nasal spray, and allergy medications were renewed. *Id*. at 33-34. Her nasal and mucosal membranes were normal. *Id*.

Plaintiff was seen by Ikanke Edem, R.N., for an emergency sick call on August 6, 2016, after indicating that she suffered from difficulty breathing and had consumed bleach because she wanted to kill herself.  ECF 8-4 at 35. She reported throwing up in her room and stated that she no longer was suicidal. *Id*. Per the Order of Dr. Sisay, plaintiff was taken to the Bon Secours Hospital ("BSH") emergency room ("ER").  *Id.*  Dr. Walks, the on-call psychiatrist, was also notified. *Id*. At the ER plaintiff was placed on an IV drip and anti-nausea and antacid drugs were administered.  *Id*. at 37.  She was discharged and returned to the MCIW mental health unit the same day.  *Id*. at 41.

Upon plaintiff's return to MCIW, she was seen by Childrea Michaels, R.N., for a nursing assessment.  ECF 8-4 at 39. Plaintiff denied suicidal thoughts and indicated she wished to be released from the mental health unit. She was advised that she had to be evaluated by the Treatment Team, who would decide whether to discharge her. *Id*.

Della Sangah, R.N.P., saw plaintiff on August 9, 2016, during mental health rounds. *Id*. at 46-47.  Plaintiff denied ingesting bleach. *Id*. at 46. She reported that she suffered from chronic headaches that did not respond to pain medications.  She indicated that she was attacked on November 19, 2014, hit on the head multiple times, and suffered  headaches ever since. She denied any visual changes or other neurological changes. She requested a CT scan of her head (*id*.), and a consult for a CT scan was requested.  *Id*. at 48-49.

Plaintiff was seen by Talibah E. Buchanan, Ph.D., on August 9, 2016, for a mental health evaluation. *Id*. at 50. Plaintiff denied trying to harm herself or drinking bleach and indicated that it was an attempt to obtain anti-nausea medication. *Id*.

Kamara's prescriptions for Indocin, nasal spray, and Zyrtec were renewed on August 24, 2016, during a provider sick call visit. *Id*. at 51-53.  She reported at that time that she continued

to suffer right shoulder pain from a fall on May 1, 2016.  ECF 8-4 at 51.  Her physical examination was unremarkable. *Id*. at 52.

On September 2, 2016, plaintiff was transported to BSH for a CT scan. *Id*. at 54-55. The CT scan revealed "[n]o intracranial abnormalities."  *Id*. at 56.  The results of the CT scan were reviewed with plaintiff on September 12, 2016.  *Id.* at 57.  According to the records, plaintiff was upset that the results of the scan were normal. *Id*.

Dr. Singh evaluated plaintiff on September 19, 2016. *Id*. at 59-60.  Plaintiff's gait, coordination, and balance were intact. Plaintiff was observed sitting comfortably in the chair and answered questions appropriately.  *Id.* at 59.  However, the record reflects that she appeared "angry" and demanded a "'nerve test,'" stating:  "'I will go the same route to get it, as I did for the CAT scan.'"  *Id*. Plaintiff also demanded a note stating that she was allergic to peanut butter and requested more dandruff shampoo. *Id*.

Dr. Singh reviewed plaintiff's medical records with her, noted that the CT scan was normal, plaintiff's blood pressure was borderline, there was no prior mention of a peanut allergy, and the dandruff shampoo order remained active. *Id*. Further, Dr. Singh noted that plaintiff continued to go to different providers for pain medication.  *Id*. Dr. Singh counselled plaintiff regarding diet, exercise, weight control, the side effects of NSAIDS (including rebound headaches and uncontrolled blood pressure) and polypharmacy.  *Id*.  According to the record, plaintiff "remained hostile, argumentative, threatening, [and] left [the] exam room briskly," without completion of the examination.  *Id*.

In addition, the record indicates normal lab work from August 29, 2016; March 3, 2016; March 17, 2016; August 20, 2015; and September 16, 2015.  ECF 8-4 at 59. Elbow x-rays taken on May 12, 2016, were also normal, as was the CT scan of Kamara's head on September 2,

2016.  ECF 8-4 at 59.  However, plaintiff was treated for H pylori after a positive lab test on October 9, 2015.  *Id.*

## II.  Standard of Review

Defendants' Motion (ECF 8) is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.   A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."   Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed Appx. 220, 222 (4th Cir. 2016) (per curiam).  Nevertheless, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[3]

---

[3] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).  This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id*. at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id*. at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015).  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its

---

Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC, supra*, 672 Fed. Appx. at 222 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).

The failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary"

and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff previously sought (ECF 10) and was denied (ECF 14) discovery. I previously found that she had failed to file an affidavit under Rule 56(d), and had failed to specify what information she sought through her request for depositions or how such information was necessary for her opposition. ECF 14 at 4. Plaintiff has done nothing to cure these deficiencies. As such, I am satisfied that it is appropriate to address defendants' motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  As indicated, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, ____ F.3d ____, 2017 WL 2989483, at *1 (4th Cir. July 14, 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

14

Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC,* 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Because plaintiff is self-represented, her submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

## III. Discussion

### A.    Wexford and Conn

In regard to the claim of denial of adequate medical treatment, the Complaint does not allege any personal participation by Wexford or Conn, who plaintiff identifies as the President and CEO of Wexford. In plaintiff's response to the Motion (ECF 10), she asserts that she complained to Conn but he "failed to take action" and was "very nonchalant." *Id.* at 2. Moreover, she adds that because Conn is the President of Wexford, "he do not have to directly

involved [sic], because of his position he make him responsible." *Id.*  She also complains that Conn "failed to take steps" to assure "an adequate medical care system." *Id.*

Liability under §1983 attaches only upon personal participation by a defendant in the constitutional violation.  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  Simply stated, plaintiff's allegations fail to state a claim against Wexford or Conn.

To the extent that plaintiff seeks to hold Wexford and Conn liable as supervisors, her claim also fails.  It is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no *respondeat superior* liability under § 1983).  Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  Where, as here, a plaintiff points to no action or inaction on the part of supervisory defendants that resulted in a constitutional injury, the claims against the supervisory personnel must be dismissed.

B.     Doctor Singh

16

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant or the failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put

17

another way, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), resonates here: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have

18

unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

However, even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v.*

19

*Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Moreover, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Thus, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986). And, disagreements between an inmate and medical staff as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169 (Actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

Dr. Singh is a licensed physician in Maryland. ECF 8-5, ¶ 1. She is employed by Wexford to provide medical services at MCIW. *Id.* In her Affidavit, Dr. Singh has averred that the medical records for plaintiff are true and accurate records. *Id.* Moreover, plaintiff does not dispute their accuracy.

The medical records reflect that plaintiff is in her mid 30's. *See*, *e.g.*, ECF 8-4 at 1.

20

Further, the records demonstrate that plaintiff was seen regularly by medical and mental health staff.  *See* ECF 8-4; ECF 8-5, ¶¶ 8 & 9.  Notably, "medical staff have never clinically observed any leaking nasal fluid . . . or twitching facial muscles."  ECF 8-5, ¶¶ 7, 8.  Moreover, plaintiff was consistently provided with analgesic medication, diagnostic testing, such as the CT scan, and counselling.  *Id*.  The CT scan showed no head injury. *Id*.  Kamara's claims that her medical needs were not met, and that further diagnostic testing was required and/or recommended, are not supported by the record.  *Id*., ¶ 8.

Plaintiff's grievances with the medical decisions regarding the necessity for certain tests and treatment are reflective of her frustration, but  "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim [for deliberate indifference] unless exceptional circumstances are alleged."  *Wright*, 766 F.2d at 849 (citing *Gittlemacker,* 428 F.2d at 6).  There are no exceptional circumstances alleged in this case.  And, to the extent that some of plaintiff's complaints have gone unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference."  *Estelle*, 429 U.S. at 105.

Dr. Singh opines that plaintiff received appropriate medical care to treat her conditions. ECF 8-5, ¶ 11.  There is no evidence that plaintiff was deprived of analgesic or other necesssary medication.  *Id.*, ¶ 10.  Dr. Singh avers that plaintiff was consistently treated for headache pain and that, due to the potential side effects of NSAIDS, plaintiff's NSAID prescriptions were intentionally issued for only a few weeks at a time, which allowed medical staff to monitor plaintiff for side effects. *Id*., ¶ 9.  Dr. Singh also avers that in her opinion plaintiff  sought pain medication from numerous care providers in order to obtain additional pain medication, particularly NSAIDs. *Id*. ¶ 10.  To the extent that Dr. Singh failed, on an unspecified occasion, to

renew plaintiff's medication, such conduct is at most a claim of negligence, which is not actionable here.

In sum, plaintiff's claims are nothing more than disagreements with the decisions of her medical providers. Dr. Singh is entitled to summary judgment.

## IV.   CONCLUSION

For the foregoing reasons defendants' dispositive motion, treated as a motion for summary judgment, will be GRANTED and judgment will be ENTERED in favor of defendants and against plaintiff.  A separate Order follows.


July 26, 2017                          _____/s/_____
Date                                   Ellen L. Hollander
                                       United States District Judge